IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CHEMLOGIX LLC,

Plaintiff,

v.

BULK TAINER LOGISTICS NORTH
AMERICA, INC., BULK TAINER
LOGISTICS (U.S.A.), INC., AND BULK
TAINER LOGISTICS LTD.,

Defendants.

CIVIL ACTION
NO. 22-1006

## OPINION

Slomsky, J.                                         September 5, 2023

### I.    INTRODUCTION

On March 16, 2022, Plaintiff ChemLogix LLC initiated this case against Defendants Bulk
Tainer Logistics Ltd., Bulk Tainer Logistics North America, Inc., and Bulk Tainer Logistics
(U.S.A.), Inc. (collectively "Bulk Tainer Logistics" or "Defendants") alleging that Defendants
infringed Plaintiff's trademark rights in its "BULKTAINER" mark.[1]  In its Complaint,[2] Plaintiff
alleges that Bulk Tainer Logistics committed: 1) Federal Trademark Infringement under Section

---

[1]   The "BULKTAINER" mark is registered under U.S. Trademark Registration No. 2,008,600
("the '600 Registration).  (Doc. No. 26 ¶ 12.)  The "BULKTAINER" mark is also used in
Plaintiff's U.S. Trademark Registration No. 4,104,654 for the mark "CHEMLOGIX GLOBAL
WWW.CHEMLOGIX.COM BULKTAINER".  (Id. ¶ 13-14.)

[2]   Plaintiffs twice amended their Complaint.  (See Doc. Nos. 3, 26.)  On April 25, 2022, Plaintiffs
filed a First Amended Complaint (Doc. No. 3), and on September 19, 2022, Plaintiffs filed a
Second Amended Complaint (Doc. No. 26).  The Second Amended Complaint remains the
Operative Complaint in this case (Doc. No. 26) and contains the same claims as alleged in the
original Complaint (Doc. No. 1.)

32(a) of the Lanham Act, 15 U.S.C. § 1114 (Count I);  2)  Federal Unfair Competition and a False Designation of Origin under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (Count II);  3) Common Law Trademark Infringement under Pennsylvania Law (Count III);  4)  Common Law Unfair Competition under Pennsylvania Law (Count IV);  and 5)  Unjust Enrichment under Pennsylvania Law (Count V).  (Doc. No. 26 ¶¶ 37-72.)

After the initial Complaint was filed, numerous pleadings were submitted by the parties culminating in the filing of Defendants' January 12, 2023 Second Amended Answer, Affirmative Defenses and Counterclaims to Plaintiff's Second Amended Complaint.  (Doc. No. 43.)  These Affirmative Defenses and Counterclaims are the subject of Plaintiff's Motion to Dismiss at issue here, which was filed on January 26, 2023.  (Doc. No. 44.)  In its Motion, Plaintiff moves to dismiss Defendants' Counterclaims I, II and III and to Strike Defendants' Fourth, Tenth and Eleventh Affirmative Defenses.  (Doc. No. 44.)  Counterclaims I, II and III are as follows:

- First Counterclaim: Declaratory Judgment of Non-Infringement and No Damages

- Second Counterclaim: Cancellation of U.S. TM Reg. No. 2,008,600 for Failure to Function as a Trademark Due to Generic Use under 15 U.S.C. § 1119, 15 U.S.C. §1064, 15 U.S.C. §1065

- Third Counterclaim: Cancellation of U.S. TM Reg. No. 2,008,600 for Failure to Function as a Trademark Due to Abandonment and No Continuing Commercial Impression under 15 U.S.C. § 1119, 15 U.S.C. §1064, and 15 U.S.C. §1127

(Doc. No. 43 at 33, 35, 38.)  Defendants' Fourth, Tenth and Eleventh Affirmative Defenses are as follows:

- Fourth Affirmative Defense: Invalidity of Plaintiff's '600 Trademark Registration

- Tenth Affirmative Defense: Crowded Field and Failure to Police the Claimed '600 Trademark

- Eleventh Affirmative Defense: Generic Use of the Claimed '600 Trademark

(Id. at 11, 13.)

On February 9, 2023, Defendants filed a Response in Opposition (Doc. No. 45), and on February 16, 2023, Plaintiff filed a Reply (Doc. No. 46).  Plaintiff's Motion to Dismiss is now ripe for disposition.  For reasons that follow, Plaintiff's Motion to Dismiss will be denied in its entirety.

## II.   FACTUAL BACKGROUND

### A.  Plaintiff's Business and the '600 Registration

Plaintiff Chemlogix LLC is a "third-party logistics provider of transportation management systems, managed services, supply chain consulting and intermodal transportation services" for numerous industries.[3]   (Doc. No. 26 ¶¶ 10-11.)   Plaintiff primarily provides supply chain consulting services and domestic transportation management for the chemical industry in the United States.  (Doc. No. 43 ¶ 63.)  Further, since 2008, Plaintiff has offered transportation of bulk liquids by train and truck in the United States.  (Id. ¶ 11.)  Plaintiff is not an international intermodal shipper, but does offer domestic intermodal shipping.  (Id. ¶¶ 63-64.)

Plaintiff owns by assignment U.S. Trademark Registration No. 2,008,600 for the mark "BULKTAINER" for "transportation of bulk liquids by train and truck services."[4]  (Doc. No. 26 ¶

---

[3]   "International intermodal shipping consists of transporting products/materials in a single container, or "tainer" for short, using multiple modes of transportation including over land by truck and/or railway and/or over sea by ship."  (Doc. No. 43 at 16 ¶ 10.)

[4]   Plaintiff also owns common law rights in the trademark and design depicted in U.S. Trademark Registration No. 4,104,654 ('654) for the mark "CHEMLOGIX GLOBAL WWW.CHEMLOGIX.COM BULKTAINER" for "transportation of bulk liquids by train and truck services."  (Doc. No. 26 ¶ 13.)  This mark is expired due to nonrenewal.  (Id.; Doc. No. 43 at 15.)  Moreover, Plaintiff's parent company owns at least one federal trademark registration, Registration No. 4,505,353, for the mark "CLX LOGISTICS," for use in connection with "[b]usiness management services, namely, managing logistics, reverse logistics, supply chain services, supply chain visibility and synchronization, supply and demand forecasting and product distribution processes for others."  (Doc. No. 43 ¶ 61.)  These

12.)  The original owner of the '600 Registration for the mark "BULKTAINER" was Union Pacific Railroad Company ("Union Pacific").  (Doc. No. 43 ¶ 47.)  On April 3, 2008, Union Pacific announced that it would transfer its entire Bulktainer service to Plaintiff.  (Id. ¶ 48.)  Several years later, on April 1, 2011, Union Pacific assigned the '600 registration to Plaintiff.  (Id. ¶ 49.)

In 2014, Plaintiff announced it was rebranding itself under its parent company's mark, "CLX."  (Id. ¶ 54.)  In early 2015, Plaintiff began to phase out the use of "BULKTAINER" as a brand or mark, when Plaintiff's website moved to its parent company's website, CLX Logistics. (Id.)  About this time, Plaintiff stopped using "BULKTAINER" as a source-identifier in connection with its intermodal shipping services.[5]  (Id. ¶¶ 54-55.)  Since 2015, Plaintiff has not used the term "Bulktainer" as a standalone source-identifying trademark on its container tanks, but rather only as part of the compound mark "Chemlogix Global www.chemlogix.com Bulktainer."  (Id. ¶ 57.) It also has used the wording "CLX Bulktainers" in the body of web text, with CLX as the source-identifier.  (Id. ¶ 57.)  To the extent that Plaintiff offers domestic intermodal shipping, it has done so under the mark "CLX" since about 2015.  (Id. ¶ 64.)

Since 2018, Plaintiff was aware of Defendant operating within the United States.  (Id. ¶ 65.)  At this time, representatives for the parties met to discuss potential bulk shipment business opportunities between them.  (Id.)  Rate sheets and invoices produced by Defendants and relating to these discussions included the allegedly infringing mark, "BULK TAINER LOGISTICS."  (Id. ¶¶ 65-67.)  Plaintiff did not complain about Defendant's use of this mark at any time between 2018 and 2021.  (Id. ¶ 68.)

---

marks are not at issue in Defendants' Counterclaims or affirmative defenses.  (See generally Doc. No. 43.)

[5]   A source-identifier is a mark that serves to identify a particular source of a product or service. See Wal-Mart Stores, Inc. v. Samara Bros., 529 U.S. 205, 210-11 (2000).

**B.  Intermodal Shipping Industry**

International intermodal shipping is a method of transporting products and materials in a single container, or "tainer" for short, using multiple modes of transportation including over land by truck or railway, and/or over sea by ship.  (<u>Id.</u> ¶ 10.)  Intermodal shipping can be domestic (within one country) or international (crossing through more than one country).  (<u>Id.</u>)  Domestic and international intermodal shipping are distinct markets.  (<u>Id.</u>)  The containers used in intermodal shipping are also called "bulk containers," "bulktainers," "tanks," "ISOtanks" or "ISOtainers." (<u>Id.</u> ¶ 11.)  The goods being shipped remain in the same container from the time they are loaded until the end point where they are offloaded.  (<u>Id.</u>)

International intermodal shipping is a "business-to-business" industry.  (<u>Id.</u> ¶ 12.)  This means that bulk transport services normally work with representatives from customers and suppliers of various liquid products, such as paints and liquid fertilizers.  (<u>Id.</u>)  At times, intermodal shippers lease container tanks from third parties.  (<u>Id.</u> ¶ 17.)  This means that an intermodal shipper may at times use a container marked with their own brand, but at other times use a container marked with another brand.  (<u>Id.</u>)

The words bulk, container, and its abbreviation "tainer" are used to refer to key aspects of the intermodal shipping of bulk materials.  (<u>Id.</u> ¶ 18.)  For example, they show contents are shipped in bulk and the shipments are made in container tanks.  (<u>Id.</u>)  Many companies that offer intermodal shipping services use one or more of the words bulk, container, or its abbreviation "tainer" in their company names.  (<u>Id.</u> ¶ 21.)  Examples of such use are:  Textainer, Euro Tainer, Bulkglobal Logistics, Bulk Connection, Transtainer, Gotainer LLC, Bulk Logistic Solutions, UltraBulk, Bulkhaul Ltd, Royaltainer, Bulk Equipment Corp., Unitainer, DHL Ocean Bulk, Bulkmatic, Chem-Tainer, and Interbulk USA.  (<u>Id.</u>)

### C.  Defendant's Intermodal Shipping Business and Use of the Alleged Infringing Mark

Defendant Bulk Tainer Logistics UK was founded in 2009 and provides international intermodal shipping of bulk liquid products, including bulk liquid chemicals, feed, and hazardous materials.  (Id. ¶ 29.)  Defendants initially began filling, transporting, and shipping bulk products using container tanks in the United Kingdom and Netherlands, but have since expanded to using more than 8,115 container tanks across the globe.  (Id. ¶ 44.)  Moreover, Defendants "first shipped to/through the United States in 2014," and now have "100-200 container tanks traveling to, briefly overland through, and back out of the United States at any given time."  (Id. ¶ 45.)

The name Bulk Tainer Logistics was selected to represent the services offered by Defendants. "Bulk" refers to the bulk liquid products to be loaded, shipped, and offloaded; "Tainer," which is short for container, advertises that it ships the products in ISO container tanks used in the industry; and "Logistics" signifies that BTL necessarily operates using shipping logistics.  (Id. ¶ 30.)  When it selected this name, Defendants Bulk Tainer Logistics was unaware of Plaintiff's "BULKTAINER" mark.  (Id. ¶ 31.)

In 2009, Defendants began using the domain name "bulktainerlogistics.com" to operate a globally accessible website.  (Id. ¶ 32.)  Around this time, Defendants also created their "orange and blue globe-inspired logo, which i[t] uses globally to this day with the words Bulk Tainer Logistics."  (Id. ¶ 33.)  This logo appears permanently on their containers.  (Id.)

## III.   STANDARD OF REVIEW

### A.   Motion to Dismiss

"Courts evaluate a motion to dismiss a counterclaim under the same standard as a motion to dismiss a complaint." Mr. Sandless Franchise, LLC v. Karen Cesaroni LLC, 498 F. Supp. 3d 725, 732 (E.D. Pa. 2020).   Therefore, in analyzing a Motion to Dismiss Defendants'

Counterclaims, the Court must "accept all factual allegations as true, construe the [counterclaim] in the light most favorable to the [Defendant], and determine whether, under any reasonable reading of the [counterclaim], the [Defendant] may be entitled to relief." NTP Marble, Inc. v. AAA Hellenic Marble, Inc., 799 F. Supp. 2d 446, 450 (E.D. Pa. 2011) (citations omitted) (alterations in original).

The motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim is set forth in Ashcroft v. Iqbal, 556 U.S. 662 (2009). After Iqbal it is clear that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to defeat a Rule 12(b)(6) motion to dismiss. Id. at 678; see also Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007). Therefore, to survive dismissal, a [counterclaim] "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" Tatis v. Allied Interstate, LLC, 882 F.3d 422, 426 (3d Cir. 2018) (quoting Iqbal, 556 U.S. at 678). Facial plausibility is "more than a sheer possibility that a [Plaintiff] has acted unlawfully." Id. (quoting Iqbal, 556 U.S. at 678). Instead, "[a] claim has facial plausibility when the [Defendant] pleads factual content that allows the court to draw the reasonable inference that the [Plaintiff] is liable for the misconduct alleged." Id. (quoting Iqbal, 556 U.S. at 678).

"Under the plausibility pleading standard, this Circuit uses a three-step process to evaluate a motion to dismiss [a counterclaim] for failure to state a claim for relief." Lutz v. Portfolio Recovery Assocs., LLC, 49 F.4th 323 (3d Cir. 2022):

> The first step in that process requires an articulation of the elements of the claim. The second step involves reviewing the [counterclaim] and disregarding any "'formulaic recitation of the elements of a ... claim' or other legal conclusion," as well as allegations that are "so threadbare or speculative that they fail to cross the line between the conclusory and the factual." The third step evaluates the plausibility of the remaining allegations. That involves assuming their veracity, construing them in the light most favorable to the [defendant], and drawing all reasonable inferences in the [defendant]'s favor.

Id. at 327-28 (internal citations omitted).  The inquiry is normally broken into three parts: "(1) identifying the elements of the claim, (2) reviewing the [counterclaims] to strike conclusory allegations, and then (3) looking at the well-pleaded components of the [counterclaim] and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

A [counterclaim] must do more than allege a plaintiff's entitlement to relief, it must "show" such an entitlement with its facts.  Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (citing Phillips v. County of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008)).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the [counterclaim] has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (alteration in original) (citation omitted).  The "plausibility" determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id.

### B.   Motion to Strike

Federal Rule of Civil Procedure 12(f) provides in pertinent part that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  At times, "motions to strike 'serve a useful purpose by eliminating insufficient defenses and saving the time and expense which would otherwise be spent in litigating issues which would not affect the outcome of the case.'"  White v. PNC Fin. Servs. Grp., Inc., No. 11-7928, 2017 WL 3675311, at *2 (E.D. Pa. Aug. 24, 2017) (quoting Mifflinburg Telegraph, Inc. v. Criswell, 80 F. Supp. 3d 566, 573 (M.D. Pa. 2015)) (citations omitted).  But "[t]he striking of a pleading is 'a "drastic remedy" to be used sparingly because of the difficulty of deciding a case

without a factual record.'"  Id. (quoting Dann v. Lincoln Nat'l Corp., 274 F.R.D. 139, 142 (E.D. Pa. 2011) (citations omitted).  Therefore, "[m]otions to strike are generally disfavored."  Id.

Furthermore, courts in the Third Circuit have found that the pleading standard set forth in Twombly and Iqbal is not the standard to be used when assessing whether affirmative defenses are sufficiently pled.  "In Twombly and Iqbal, the Supreme Court held that every claim in a complaint must contain sufficient factual allegations to suggest the claim 'is plausible on its face.'"  Curbio, Inc. v. Miller, No. 22-3619, 2023 WL 2505534, at *3 (E.D. Pa. Mar. 13, 2023) (citing Ashcroft, 556 U.S. at 678).  The Third Circuit, however, "has not ruled on whether a litigant asserting an affirmative defense must similarly plead facts sufficient to suggest the defense 'is plausible on its face,' and district courts in this Circuit and across the country are split on the issue."  Id. at *3 (citations omitted).  Despite this split, courts in the Third Circuit have held that the Twombly and Iqbal pleading standard does not apply to affirmative defenses.  See Miller, 2023 WL 2505534, at *4; Atain Ins. Co. v. V2 Properties, LLC, No. 22-288, 2022 WL 16639284, at *6 (E.D. Pa. Nov. 2, 2022); Tyco Fire Prod. LP v. Victaulic Co., 777 F. Supp. 2d 893, 900 (E.D. Pa. 2011).  Having considered the parties' arguments and the case law, the Court agrees that Twombly and Iqbal do not apply to affirmative defenses.  Therefore, a defendant "must only provide the opponent fair notice of the issue involved."  Tyco Fire Prod. LP, 777 F. Supp. 2d at 903.  A defendant has provided fair notice under Fed. R. Civ. P. 8(c)(1) when "the affirmative defense in question alerts the adversary to the existence of the issue for trial."  Id. at 901.

**IV.    ANALYSIS**

    **A.  Defendants' Motion to Dismiss the First, Second and Third Counterclaims Will Be Denied**

        **1.  Plaintiff Incorrectly Argues that Defendants' First, Second and Third Counterclaims Are Based On a Theory of Mere Descriptiveness When They Are Not**

To begin with, Plaintiff seeks dismissal of Defendants' First, Second and Third Counterclaims based on an incorrect theory of what Defendant alleges in those counterclaims. Plaintiff believes that the First, Second and Third Counterclaims are based on allegations that the registered mark is merely descriptive when in fact different theories are alleged by Defendant. While courts have indeed found that "[m]ere descriptiveness is not recognized . . . as a basis for challenging an incontestable mark," this is not what Defendant claims in its Counterclaims that Plaintiff seeks to dismiss.  See Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 196 (1985); see also Reflex Media, Inc. v. SuccessfulMatch.com, No. 20-CV-06393-JD, 2022 WL 17477109, at *3 (N.D. Cal. Dec. 6, 2022).[6]  In trademark law, a mark becomes incontestable "[i]f, five years after that initial registration, the registrant certifies that no court, nor the USPTO, has ruled against its ownership."[7] I.M. Wilson, Inc. v. Otvetstvennostyou "Grichko", 614 F. Supp. 3d 114, 138 (E.D. Pa. 2022) (citing 15 U.S.C. § 1065).  Further, a mark is "merely descriptive" if the mark describes the qualities or characteristics of a good or service." Id. at 194.

---

[7]  Plaintiff argues that their "BULKTAINER" mark covered by the '600 registration is incontestable. (Doc. No. 44-1 at 5.)  "[T]he right of the owner to use such registered mark in commerce for the goods or services on or in connection with which such registered mark has been in continuous use for five consecutive years subsequent to the date of such registration and is still in use in commerce, shall be incontestable."  15 U.S.C. § 1065.  Defendants apparently do not challenge the incontestability of the "BULKTAINER" mark.  (See Doc. No. 45 at 6.)

In their first counterclaim, Defendants seek a declaratory judgment of non-infringement because there is no likelihood of confusion caused by their "Bulk Tainer Logistics" logo.[8] (Doc. No. 43 ¶ 70.)  In support of their claim that there is no likelihood of confusion, Defendants explain: "given the generic or at best descriptive nature of the terms Bulk, Container, its abbreviation Tainer, and/or Bulktainer, many companies commonly use those terms in connection with shipping products and services and consumers have therefore learned to look to other elements of a company's branding to distinguish the source of the goods or services." (Id. ¶ 75.)  This explanation is not a challenge to Plaintiff's "BULKTAINER" mark based on mere descriptiveness. (Id. ¶¶ 70-83; Doc. No. 45 at 7-8.)  It is not being used to designate the qualities or characteristics of a good or service.

Next, in their Second Counterclaim brought under Section 37 of the Lanham Act (15 U.S.C. § 1119), Section 14 of the Lanham Act (15 U.S.C. § 1064) and Section 15 of the Lanham Act (15 U.S.C. § 1065), Defendants allege that the '600 mark should be cancelled because it is used generically and therefore fails to function as a trademark.  (Doc. No. 43 ¶¶ 84-93.)  They assert "[t]he words bulk, container, and its abbreviation tainer, and 'bulktainer' are each typically used to refer to key aspects of the service of shipping bulk liquids or other bulk materials." (Id. ¶ 89.)  Moreover, "[m]any third parties have used the terms 'bulk,' 'container,' and 'tainer,' which is short for container, and/or 'bulktainer' to descriptively or generically to refer to types of container tanks and, as such, consumers perceive 'bulktainer' as a descriptive or generic in the bulk shipment industry and not as a source-identifier," and that Plaintiff "itself uses 'bulktainer'

---

[8]  "Likelihood of confusion is [] the test for actions brought under section 43(a) of the Lanham Act." Fisons Horticulture, Inc. v. Vigoro Indus., Inc., 30 F.3d 466, 473 (3d Cir. 1994).

in a pluralized fashion generically or descriptively to refer to the type of ISO container tanks in which it ships bulk materials and not as a source-identifier." (Id. ¶¶ 90-91.)

In the Second Counterclaim, Defendants challenge Plaintiff's mark for its generic use. To the extent Defendants use the word "descriptively," if it is used in the sense of being "merely descriptive" this cannot be a basis for challenging an incontestable mark. However, "[t]he descriptiveness allegations are directed at use and understanding of the Bulktainer term by third parties," and for this reason Defendants argue the mark is being used in a generic sense. Again, it is not being used to designate the qualities or characteristics of a good or service. If used in this sense, the claim is permissible. (Doc. No. 43 ¶¶ 84-93.)

Finally, in their Third Counterclaim brought under Section 37 of the Lanham Act (15 U.S.C. § 1119), Section 14 of the Lanham Act (15 U.S.C. §1064), and Section 45 of the Lanham Act (15 U.S.C. §1127), Defendants allege that the '600 mark should be cancelled due to abandonment and lack of continuing commercial impression. (Doc. No. 43 ¶¶ 94-105.) Once again, Defendants use the word "descriptive" in their Third Counterclaim. As noted above, to the extent the word "descriptive" refers to a mark being "merely descriptive," this cannot be a basis for challenging an incontestable mark. Here, however, the only place the word "descriptive" appears is in Defendants' assertion that Plaintiff's marks "CLX and ChemLogix are registered trademarks themselves and not generic or descriptive words." (Doc. No. 45 at 8.) Although this allegation does not specifically refer to cancellation of the mark due to abandonment of the mark and lack of continuing commercial impression, Defendants do not allege in this counterclaim that Plaintiff's mark is merely descriptive. It is not being used to designate the qualities or characteristics of a good or service. Used in this way, this claim too is permissible.

12

### 2.   In the Second Counterclaim Defendants Also Have Sufficiently Stated a Claim for Cancellation of the '600 Registration Based On Generic Use

Plaintiff also moves to dismiss Defendants' Second Counterclaim in which Defendants seek cancellation of the '600 patent due to generic use of the "BULKTAINER" mark.  (Doc. No. 44-1 at 6.)  In moving to dismiss the Second Counterclaim for failure to state a claim, Plaintiff makes numerous arguments as to why Defendant's claim of genericness is not sufficiently pled. (See id. at 6-13.)  Plaintiff's arguments, however, are unavailing.  For the following reasons, Defendants have sufficiently alleged a claim for cancellation of the '600 mark due to generic use.

Section 14 of the Lanham Act provides that a registered mark may be cancelled if it becomes generic.  15 U.S.C. § 1064.  The Act provides in pertinent part:

> A petition to cancel a registration of a mark, stating the grounds relied upon, may, upon payment of the prescribed fee, be filed as follows by any person who believes that he is or will be damaged, including as a result of a likelihood of dilution by blurring or dilution by tarnishment under section 1125(c) of this title, by the registration of a mark on the principal register established by this chapter, or under the Act of March 3, 1881, or the Act of February 20, 1905:
>
> . . .
>
> (3) At any time if the registered mark becomes the generic name for the goods or services, or a portion thereof, for which it is registered.  . . . If the registered mark becomes the generic name for less than all of the goods or services for which it is registered, a petition to cancel the registration for only those goods or services may be filed. A registered mark shall not be deemed to be the generic name of goods or services solely because such mark is also used as a name of or to identify a unique product or service. The primary significance of the registered mark to the relevant public rather than purchaser motivation shall be the test for determining whether the registered mark has become the generic name of goods or services on or in connection with which it has been used.

Id.  Furthermore, the Supreme Court has held that "[g]eneric terms are not registrable, and a registered mark may be canceled at any time on the grounds that it has become generic." Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 194 (1985).  As codified in the Lanham Act, the primary significance of the registered mark to the relevant public is the test used to determine

whether a mark is generic.  15 U.S.C. § 1064(3); see also A.J. Canfield Co. v. Honickman, 808 F.2d 291, 299 (3d Cir. 1986).  "[T]he primary significance test . . . inquires whether the primary significance of a term in the minds of the consuming public is the product or the producer."  E.T. Browne Drug Co. v. Cococare Prod., Inc., 538 F.3d 185, 194 (3d Cir. 2008) (citations omitted).  A mark is generic and "the primary significance test is generally satisfied if a term signifies a product that emanates from a single source, i.e., a product brand, but it is not satisfied if the product that emanates from a single source is not only a product brand but is also a product genus."  Honickman, 808 F.2d at 301.  It is also well-established, however, that "[t]o be generic, a term need not relate directly to the name of the product [or service], but may relate to some distinctive characteristic of that genus of products [or services]."  Dranoff-Perlstein Assocs. v. Sklar, 967 F.2d 852, 859 (3d Cir. 1992) (citations omitted).

As noted above, the primary significance test is assessed from the perspective of the "relevant public."  15 U.S.C. § 1064(3).  Therefore, a court must look at the relevant mark and "inquire whether the consuming public understands [the mark] to refer to a product genus or to a producer.  E.T. Browne, 538 F.3d at 195.  "That evaluation requires looking at the mark as a whole, not dissecting it into various parts."  Id.  "Evidence of the public's understanding of the term [at issue] may be obtained from any competent source, such as purchaser testimony, consumer surveys, listings in dictionaries, trade journals, newspapers, and other publications."  Berner Int'l Corp. v. Mars Sales Co., 987 F.2d 975, 982 (3d Cir. 1993) (quoting In re Merrill Lynch, Pierce, Fenner, & Smith, Inc., 828 F.2d 1567, 1570 (Fed. Cir. 1987)).

Determining whether a mark is generic is a "difficult task that is inappropriate at the motion to dismiss stage."  J & J Snack Food Corp. v. Soft Pretzel Franchise Sys., Inc., No. 09-1214, 2009 WL 10737680, at *4 (E.D. Pa. Oct. 27, 2009) (citations omitted).  "Whether [a mark] is generic or

14

descriptive, and whether that term has acquired secondary meaning, are questions of fact." Id. (citations omitted); see also McZeal v. Sprint Nextel Corp., 501 F.3d 1354, 1358 (Fed. Cir. 2007) ("[W]hether a term is generic is a question of fact."); Flynn v. Health Advocate, Inc., No.03-3764, 2004 WL 51929, at *6 (E.D. Pa. Jan. 13, 2004) ("The Court finds it is inappropriate at this stage in the litigation for the Court to classify the mark, since such an issue involves factual considerations that should not be considered in a motion to dismiss.").

Here, Defendants allege facts sufficient to state a counterclaim for cancellation of Plaintiff's '600 registration due to the "BULKTAINER" mark being generic.  Put differently, Defendants allege facts that, when taken as true, show "BULKTAINER" can be understood by the relevant public to refer to a product rather than ChemLogix LLC as being the source of the container.  Defendants allege that:

> The words bulk, container, and its abbreviation tainer, and "bulktainer" are each typically used to refer to key aspects of the service of shipping bulk liquids or other bulk materials, namely, that the contents are shipped in bulk (as opposed to individual saleable units) and the shipments are made in container tanks.

(Doc. No. 43 ¶ 89.)  Furthermore, they also allege that "[m]any third parties have used the terms 'bulk,' 'container,' and 'tainer,' which is short for container, and/or 'bulktainer' to descriptively or generically to refer to types of container tanks." (Id. ¶ 90.)  Defendants even assert that "[Plaintiff] itself uses 'bulktainer' in a pluralized fashion generically or descriptively to refer to the type of ISO container tanks in which it ships bulk materials and not as a source-identifier." (Id. ¶ 91.)

Defendants also point to examples of journal, publications, and other sources where the term "bulktainer" is used to refer to a product used in intermodal shipping, rather than a source. For example, Defendants allege:

> Various publications have made generic or descriptive uses of the term "bulktainer" referring to container tanks in general and not any one brand of container tank or any one brand of services related to bulk shipping. For example, in the American

Journal of Transportation article announcing Union Pacific's transfer of its Bulktainer service to ChemLogix, it did not inform that Bulktainer is a brand of Union Pacific or ChemLogix. Instead, it explained that bulktainers are "types of International Organization for Standardization (ISO) intermodal container tanks used for the long distance transportation of bulk liquids that combines the reliability of truck with the longhaul safety and efficiency of rail travel."

(Id. ¶ 22.)   Defendants further allege that "in a 2011 publication of the Western Petroleum Marketers Association, there is a classified advertisement generically stating: 'We are looking for 8 ISO TANKS 24,000 Liter (6200 gallons) Steel Bulktainers.'"   (Id. ¶ 24.)   Defendants provide numerous examples of the term "bulktainer" being used to describe a product rather than a source. (See id. ¶¶ 18-28.)  At this stage in the litigation, the Court must take Defendants' allegations as true, and here all of these facts are sufficient to show Defendant has alleged Plaintiff's "BULKTAINER" mark is generic.  Therefore, Plaintiff's Motion to Dismiss will be denied as to Defendants' Second Counterclaim for this additional reason.

### 3.   In the Third Counterclaim Defendants Also Have Sufficiently Stated a Claim for Cancellation of the '600 Registration Based On Abandonment

Plaintiff next moves to dismiss Defendants' Third Counterclaim in which Defendants seek cancellation of the '600 patent due to abandonment and lack of continuing commercial use of the "BULKTAINER" mark.  (Doc. No. 44-1 at 18.)  In moving to dismiss the Third Counterclaim for failure to state a claim, Plaintiff argues that "Defendants have not plead [sic] any facts supporting any allegation that ChemLogix has abandoned its 'BULKTAINER' trademark for 'transportation of bulk liquids by train and truck services' as in the '600 Registration."  (Id. at 20.)   The Court disagrees.  For the foregoing reasons, Defendants have sufficiently alleged a claim for cancellation of the '600 mark due to abandonment and lack of continuing commercial use.

Section 45 of the Lanham Act provides that a mark shall be deemed abandoned when it has been discontinued and the owner does not intend to resume use.  See 15 U.S.C. § 1127; see also Dille Fam. Tr. v. Nowlan Fam. Tr., 276 F. Supp. 3d 412, 430 (E.D. Pa. 2017) (quoting

Doeblers' Pennsylvania Hybrids, Inc. v. Doebler, 442 F.3d 812, 822 (3d Cir. 2006)) (citations omitted).  The Act also states that a mark shall also be deemed abandoned when any course of conduct by the owner causes the mark to become generic.  15 U.S.C. § 1127.  The Act further provides:

> A mark shall be deemed to be "abandoned" if either of the following occurs:
>
>> (1) When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.
>>
>> (2) When any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name for the goods or services on or in connection with which it is used or otherwise to lose its significance as a mark. Purchaser motivation shall not be a test for determining abandonment under this paragraph.[9]

15 U.S.C. § 1127.  Moreover, "[t]o establish the defense of abandonment it is necessary to show not only acts indicating a practical abandonment, but an actual intent to abandon."  Warren Pub. Co. v. Spurlock, 645 F. Supp. 2d 402, 434 (E.D. Pa. 2009) (quoting Marshak v. Treadwell, 240 F.3d 184 (3d Cir.2001)).  "[T]he requisite intent 'maybe inferred from circumstances.'"  Id. at 434 (citations omitted).

Courts have held that modifications to a mark may be considered abandonment if they do not maintain a continuing commercial impression.  PBI Performance Prod., Inc. v. Norfab Corp., 514 F. Supp. 2d 725, 730 (E.D. Pa. 2007) ("A change in the form of a mark can be protected only

---

[9]   The parties do not discuss abandonment based on the mark becoming generic, as provided for in the second part of 15 U.S.C. § 1127.  Because in Section IV(A)(2) above the Court has noted that Defendants have sufficiently alleged Plaintiff's "BULKTAINER" mark is generic, it need not address the issue of genericness again here in the context of abandonment.

if the distinctive characteristics of the mark before and after the alteration maintain the same, continuing commercial impression."); see also Fifth Ave. of Long Island Realty Assocs. v. Caruso Mgmt. Co., 718 F. Supp. 2d 292, 309 (E.D.N.Y. 2010) (plaintiff abandoned the mark "Americana" by using "Americana at Manhasset").

Here, Defendants have pled sufficient facts that, when taken as true, state a counterclaim for cancellation of the '600 mark due to abandonment and lack of continuing commercial impression.  First, Defendants allege in their Counterclaims that:

> In 2014, ChemLogix announced that it was rebranding under its parent company's mark, CLX. Specifically, ChemLogix stated: "merging our subsidiaries under one corporate brand name and logo, we will build upon the already existing synergy of our different operations to offer a wide scope of logistics and technology services through one source to a broader global audience.

(Doc. Nos. 43 ¶ 54; 43-11.)  Further, they assert: "ChemLogix began to phase out the use of 'Bulktainer' as a brand or mark in early 2015, when ChemLogix's website moved to its parent company's website, CLX Logistics."  (Doc. No. 43 ¶ 55.)  They allege that:

> ChemLogix has not used the term Bulktainer as a standalone source-identifying trademark, but rather only as part of a compound mark "Chemlogix Global www.chemlogix.com Bulktainer" on its container tanks or it has used the wording "CLX Bulktainers" in the body of web text with CLX as the source-identifier/adjective and Bulktainers in a pluralized fashion to generically describe the type of bulk container tank used to transport bulk chemicals.

(Id. ¶ 57; Doc. No. 43-12 at 2.)  Defendants submit that any intermodal shipping options offered by Plaintiff since 2015 have been under "one or more of its 'CLX' marks, not under any 'bulktainer' mark."  (Doc. No. 43 ¶ 57.)  At minimum, Defendants allege that from 2015 on Plaintiff used the term "bulktainer" only as a compound mark or to describe the type of container being used.  Defendants allege that standalone use of "BULKTAINER" stopped in 2015, well over three years before this case was initiated in 2022.  (See Doc. No. 1.)  Whether Plaintiff's use of the term "bulktainer" in conjunction with other "CLX" marks created a different commercial

impression is a question of fact not appropriate for determination on a motion to dismiss.  Cf. Hana Fin., Inc. v. Hana Bank, 574 U.S. 418, 422 (2015) (explaining that commercial impression is a "fact-intensive answer.").  So, taken as true, all of these facts are sufficient for a prima facie showing that Plaintiff abandoned use of the "BULKTAINER" mark as it transitioned to its parent company's mark, "CLX."  Accordingly, at this stage in the litigation, Defendants have sufficiently alleged abandonment and lack of continuing commercial impression.

Finally, Defendants allege that in 2014 Plaintiff announced it would "phase out" use of other identifiers as it adopted the "CLX" mark.  (Doc. Nos. 43 ¶ 54; 43-11.)  At this stage in the proceedings, where the Court must take Defendants' allegations as true, this allegation is sufficient to show an intent not to resume use of any "phased out" mark, such as the '600 registration "BULKTAINER" mark.  Therefore, all of these allegations are sufficient to show Defendants have stated a claim for cancellation of the '600 mark due to abandonment and lack of continued commercial use.  Consequently, Plaintiff's Motion to Dismiss will be denied as to Defendants' Third Counterclaim.

### B.  Motion to Strike Defendants' Fourth, Tenth and Eleventh Affirmative Defenses

#### 1.  Plaintiff Incorrectly Argues That Defendants' Fourth, Tenth and Eleventh Affirmative Defenses Are Based on Mere Descriptiveness When They Are Not

In moving to strike Defendants' Fourth, Tenth and Eleventh Affirmative Defenses, Plaintiff argues that all three affirmative defenses allege the '600 registration is merely descriptive.  (Doc. No. 44-1 at 20.)  Defendants, however, do not allege mere descriptiveness in their Fourth, Tenth and Eleventh Affirmative Defenses.

As stated above, Courts have indeed found that "[m]ere descriptiveness is not recognized . . . as a basis for challenging an incontestable mark."  Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 196 (1985).  But Defendants do not allege here in their Fourth, Tenth, or Eleventh

19

affirmative defenses that the '600 mark should be cancelled due to mere descriptiveness alone. (Doc. No. 43 at 11, 13.)  First, Defendants' Fourth Affirmative Defense alleges that the '600 registration is invalid because the mark has not been used as a source identifying mark and therefore does not function as a trademark.  (Id. at 11.)  Second, Defendants in their Tenth Affirmative Defense submit that Plaintiff failed to police its "BULKTAINER" mark and allowed many third parties to use the terms "bulk" and "tainer," or even "bulktainer," in commerce, and therefore consumers do not perceive "BULKTAINER" as a source identifier.  (Id. at 13.)  Finally, Defendants argue in their Eleventh Affirmative Defense that Plaintiff's "BULKTAINER" mark has become generic.  (Id. at 13-14.)  Thus, it is evident that Defendants' Fourth, Tenth and Eleventh affirmative defenses do not allege Plaintiff's mark is merely descriptive and all are adequately pled.

### 2.  Defendants' Fourth, Tenth, and Eleventh Affirmative Defenses Are Sufficiently Pled and Will Not Be Stricken

Plaintiff moves to strike Defendant's Fourth, Tenth, and Eleventh Affirmative Defenses apparently on the grounds that they are legally insufficient and Defendants failed to allege facts to support them.  (Doc. No. 44-1 at 20-22.)  The Court again disagrees.  As noted in Section III(B) above, motions to strike are to be granted sparingly and an affirmative defense need only provide fair notice of the issues involved.  Defendants have met their burden here.

First, Defendants' Fourth Affirmative Defense for invalidity of the '600 registration due to Plaintiff's non-use of "BULKTAINER" as a trademark is sufficiently pled.  Defendants have alleged that since 2015 Plaintiff has not used "BULKTAINER" as a mark in connection with its services.  (Doc. No. 45 at 24; see also Doc. No. 43 at 11.)  Rather, it has only been used as part of a compound mark with a "CLX" or "ChemLogix" creating a different commercial impression.

(Doc. No. 45 at 24.)  This allegation is sufficient to put Plaintiff on notice of the issues involved.  Consequently, Defendants' Fourth Affirmative Defense will not be stricken.

Second, Defendants' Tenth Affirmative Defense for failure of Plaintiff to police its claimed trademark against third parties is sufficiently pled.  Defendants "allege[] that many third parties in the United States and globally use the terms 'bulk' and 'tainer' and therefore consumers are able to distinguish between these company names that contain these words."  (Doc. No. 45 at 25; see also Doc. No. 43 at 13 ¶ 28.)  These allegations are sufficient to put Plaintiff on notice of the issues involved with this defense, and therefore Defendants' Tenth Affirmative defense will not be stricken.

Finally, Plaintiff's Eleventh Affirmative defense for generic use of the claimed "BULKTAINER" mark is sufficiently pled.  Defendants have given numerous examples of the term "bulktainer" being used to refer to an item, in this case the tank itself, rather than a source of goods.  (See Doc. No. 45 at 26; see also Doc. No. 34 at 13-14.)  These allegations are sufficient to put Plaintiff on notice that genericness is at issue.  Therefore, Defendants' Eleventh Affirmative defense also will not be stricken.

## V.       CONCLUSION

For the reasons stated above, Plaintiff's Motion to Dismiss Defendant's Counterclaims I, II and III of Defendants' Second Amended Complaint and to Strike Defendants' Fourth, Tenth, and Eleventh Affirmative Defenses (Doc. No. 44) will be denied.  An appropriate Order follows.